#25609-a-SLZ

**2011 S.D. 12**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

WILLIAM C. KLAGER, JR.,                   Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JACK R. VON WALD
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CRAIG M. EICHSTADT
Assistant Attorney General
and
RICHARD J. NEILL
Special Assistant Attorney General          Attorneys for plaintiff
Pierre, South Dakota                         and appellee.

H.I. KING of
Tonner, Tobin & King, LLP                    Attorneys for defendant
Aberdeen, South Dakota                       and appellant.

* * * *

ARGUED NOVEMBER 16, 2010
REASSIGNED FEBRUARY 1, 2011

OPINION FILED **03/30/11**

#25609

ZINTER, Justice (on reassignment).

[¶1.]     For more than eighty-five years, South Dakota has regulated the business of taxidermy. The regulatory scheme has consistently required licensure, recordkeeping, and the production of statutorily enumerated records during normal business hours. A licensed taxidermist was convicted of refusing to produce the required records, a violation of SDCL 41-6-33.[1] He challenged his conviction alleging that the production requirement[2] violated his Fourth Amendment right to

1.     SDCL 41-6-33 provides:

It is a Class 2 misdemeanor for a person to preserve or mount birds, animals, or fish that such person does not own without a taxidermist's license or in violation of the conditions of the license or the rules of the Game, Fish and Parks Commission.

A taxidermist's license permits the licensee to have in possession at the taxidermist's place of business, birds, animals, or fish, lawfully caught, taken, or killed, for the sole purpose of preserving or mounting them. Birds, animals, or fish or any part thereof may be transported by anyone having them legally in possession to a licensee for preserving or mounting only and for return by the licensee to the owner thereof.

The Game, Fish and Parks Commission shall approve each taxidermist's license. The commission shall promulgate rules pursuant to chapter 1-26 setting the requirements for a taxidermist's license. Each licensee shall keep a written record of all birds, animals, and fish received by the licensee. The record shall include the name and address of each specimen's owner, the number and species, and the dates of receipt and delivery of each specimen. The record and customers' specimens shall be made available for inspection by any representative of the Department of Game, Fish and Parks during normal business hours.

2.     The dissent repeatedly describes this case as one involving the *search* of Klager's records. There was no search of Klager's records, specimens, or premises. A conservation officer merely asked Klager to produce the records that SDCL 41-6-33 requires licensees to keep and produce. Klager refused

(continued . . .)

-1-

be free from unreasonable searches. Both the magistrate court and the circuit court concluded that under the holding in *New York v. Burger*, 482 U.S. 691, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987), there was no Fourth Amendment violation. We affirm.

*Facts and Procedural History*

[¶2.] William Klager Jr. operated a taxidermy business in Stratford, South Dakota, called "The Taxidermy Man." He obtained the license necessary to conduct that business from the South Dakota Game, Fish and Parks Commission in accordance with SDCL 41-6-33. On March 4, 2009, during normal business hours, a Game Fish and Parks Wildlife Conservation Officer stopped at Klager's business to inspect the records required to be kept and produced as a condition of Klager's licensure. A sign on the door of Klager's home indicated he was in his workshop at the end of the driveway. The conservation officer drove to the workshop and walked into the business premises. The officer introduced himself to Klager and requested to see Klager's taxidermy records. Klager refused.

[¶3.] Klager was charged with refusing to produce the statutorily required business records, a violation of SDCL 41-6-33. Klager moved to dismiss on the ground that production of the records violated his Fourth Amendment rights.[3] The

_____

(. . . continued)
and the officer proceeded no further. Klager was subsequently cited for failing to produce the records.

3.  Klager also alleged that SDCL 41-6-33 was unconstitutional under Article VI, Section 11 of the South Dakota Constitution. Because Klager has not pursued a separate state constitutional argument, we only address the matter under the Fourth Amendment.

magistrate court denied the motion and found Klager guilty of the class 2 misdemeanor. Klager received a thirty-day suspended jail sentence and a $151 fine. On appeal, the circuit court affirmed. Like the magistrate court, the circuit court concluded that the statutorily required production was constitutional.

[¶4.] On appeal to this Court, Klager contends that under *Burger*, taxidermists are not engaged in closely regulated businesses, and SDCL 41-6-33 does not contain equivalent guarantees of a warrant to satisfy the Fourth Amendment's exception for warrantless regulatory inspections. We review such challenges under the Fourth Amendment de novo. *State v. Bowker*, 2008 S.D. 61, ¶ 17, 754 N.W.2d 56, 62.

*Decision*

[¶5.] Since 1925, SDCL 41-6-33 and its predecessors[4] have regulated the business of taxidermy. These laws have consistently required taxidermists to be licensed, to keep specifically enumerated records of their customers and their specimens, and to make those records available for inspection during normal business hours. *Id.* The Department of Game, Fish and Parks (the Department) has also enacted administrative rules further regulating taxidermy businesses. *See infra* ¶¶ 16-17. The Department provides each licensee with a summary of the statutory and administrative regulations each year when taxidermists are licensed.

---

4. *See* S.D. Sess. Laws 1925, ch. 181. The 1939 and 2003 revisions made no material changes in the 1925 requirements. *See* SDC § 25.0302(11); S.D. Sess. Laws 2003, ch. 222, § 1. The 1925 version made violations a misdemeanor. This penalty was omitted in 1939 but reinstated in 1991. *See* S.D. Sess. Laws 1991, ch. 337, § 25. The 1991 revision limited inspections to normal business hours.

The summary also includes a number of the federal laws that further regulate taxidermy businesses, including the additional requirement of federal licensure by the United States Fish and Wildlife Service.

[¶6.]     The record reflects that Department wildlife conservation officers are provided "a general knowledge base" on how to conduct the inspections authorized under this regulatory scheme. This includes the "items" and "areas" of inspection. Although officers do not have a set schedule for conducting inspections, the Department's program administrator testified that there are approximately 200 licensed taxidermists in South Dakota, and the Department "average[s] around 100 inspections a year of taxidermists." When asked whether there were taxidermists that would not have been inspected for years, the program administrator testified: "On a given year I would say that is, is true. When you take it out over a number of years, I can't say that that would be a true statement."

[¶7.]     Unannounced inspections are conducted at the licensee's place of business during normal business hours. The inspections are unannounced because poachers are known to take illegally harvested wildlife to taxidermists for mounting, and the specimens can easily be destroyed or secreted. The inspections are intended to: protect wildlife, including wildlife under federal protection; ensure that taxidermists are in possession of only those specimens they are legally authorized to possess; ensure that specimens in the taxidermist's possession have been legally harvested; and prevent "overbagging" and illegal possession of game by taxidermists' customers.

#25609

[¶8.]     In this case, there is no dispute that at the time the conservation officer requested to see Klager's records, Klager was licensed and engaged full-time in the taxidermy business. Further, Klager does not contend that the officer's physical entry into his business premises during normal business hours violated his Fourth Amendment right to privacy. Finally, the officer conducted no search or inspection of Klager's premises to look for the records. He simply requested that Klager produce the records that SDCL 41-6-33 requires taxidermists to keep and produce. Klager refused.

[¶9.]     Klager refused even though he had given his written consent to produce the records without a warrant. In his license application immediately preceding this incident, Klager waived his Fourth Amendment rights and consented to make the records available for inspection by Department representatives any time during normal business hours.[5] Klager's written consent stated:

> I will keep a record of all specimens received for mounting and preserving. These records and specimens shall be made available for inspection by any authorized representative of the South Dakota Department of Game Fish and Parks during normal business hours.

---

5.     The dissent states that we "should be careful in expanding the 'consent' in this case, because it was made in order to obtain a license, which amounts to holding a taxidermist's livelihood hostage." Dissent note 24. It is not clear what is intended by this statement. What is clear, is that the dissent has not contended that the consent was invalid (involuntary). This of course it cannot do as Klager has not contended that his written consent was involuntary. Moreover, the Supreme Court has consistently described the matter as a business person's choice to engage in a business requiring licensure. *Burger*, 482 U.S. at 701, 107 S. Ct. at 2643; *U.S. v. Biswell*, 406 U.S. 311, 316, 92 S. Ct. 1593, 1596, 32 L. Ed. 2d 87 (1972).

-5-

[¶10.]     Klager had also received the printout of the South Dakota laws requiring the keeping and producing of records, and he conceded that he was very familiar with the laws and rules governing taxidermists. Klager even disclosed that: he was "quite extensively" involved in the development of the taxidermy regulation statute; he helped write the statutory amendments and regulations in 2003; he was aware that a taxidermist's records were required to be made available for inspection by any representative of the Department during normal business hours; and he had testified on behalf of the South Dakota Taxidermist's Association (as their vice-president) encouraging frequent inspections.

[¶11.]     "An individual must have a reasonable expectation of privacy in the place searched or the article seized before the Fourth Amendment will apply." *State v. Thunder*, 2010 S.D. 3, ¶ 16, 777 N.W.2d 373, 378. An expectation of privacy "is determined by a two-prong test: (1) whether the defendant has exhibited an actual subjective expectation of privacy and (2) whether society is willing to honor this expectation as being reasonable." *State v. Lowther*, 434 N.W.2d 747, 754 (S.D. 1989) (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 516, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring)). Considering Klager's licensure, his knowledge of the records production requirement, his public advocacy for frequent inspections, and his express written consent to this inspection, he had no actual subjective expectation of privacy in the records. Because Klager cannot satisfy the subjective expectation of privacy prong, his conviction must be affirmed on this ground alone. The parties, however, briefed the second prong, and we have elected

to also address the question whether the records inspection authorized by SDCL 41-6-33 is objectively reasonable.

[¶12.] The Supreme Court has long held that a warrant is required for a search to be considered reasonable under the Fourth Amendment. *See, e.g., See v. City of Seattle,* 387 U.S. 541, 543, 87 S. Ct. 1737, 1739, 18 L. Ed. 2d 943 (1967). However, in the business context the Court has relaxed the warrant clause of the Fourth Amendment to account for the exigencies of administrative inspections "designed to enforce regulatory statutes." *Burger*, 482 U.S. at 700, 107 S. Ct. at 2642. This is because "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *Id.* The Court has gone so far as to hold that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." *Id.* (quoting *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 313, 98 S. Ct. 1816, 1821, 56 L. Ed. 2d 305 (1978) (internal citation omitted)). "'When a dealer chooses to engage in [a] pervasively regulated business and to accept a . . . license, he does so with the knowledge that his business records . . . will be subject to effective inspection.'" *Id.* at 701, 107 S. Ct. at 2643 (quoting *Biswell,* 406 U.S. at 316, 92 S. Ct. at 1596). So significant is the necessity for effective inspection that in such "pervasively regulated" industries, the Court has dispensed with the need for a warrant at all. *Biswell,* 406 U.S. at 316-17, 92 S. Ct. at 1596-97 (permitting warrantless inspections in the gun selling industry). *See also Burger,* 482 U.S. at 703-704, 107 S. Ct. at 2644-45 (same in the vehicle-dismantling and automobile junkyard industry); *Donovan v. Dewey,* 452

U.S. 594, 602-05, 101 S. Ct. 2534, 2539-41, 69 L. Ed. 2d 262 (1981) (same in coal mines); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 76-77, 90 S. Ct. 774, 777, 25 L. Ed. 2d 60 (1970) (same in the liquor industry). The Court explained: "The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that his privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections." *Donovan,* 452 U.S. at 598-99, 101 S. Ct. at 2538.[6]

[¶13.] To find a warrantless administrative inspection reasonable under the Supreme Court's regulated business framework, the business must be closely regulated and the statute must satisfy three criteria. *Burger*, 482 U.S. at 702, 107 S. Ct. at 2644. Closely regulated industry status is an important threshold test because, as previously noted, "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Id.* at 700, 107 S. Ct. at 2642. Moreover, "[t]he businessman in a regulated industry in effect consents to the restrictions placed upon him." *Marshall,* 436 U.S. at 313, 98 S. Ct. at 1821 (quoting *Almeida-Sanchez v. United States,* 413 U.S. 266, 271, 93 S. Ct. 2535, 2538, 37 L. Ed. 2d 596 (1973)). Finally, closely regulated industry status is an important consideration in cases like this because it often informs the question whether the

---

6. This summary of the Supreme Court's business inspection jurisprudence is taken from *In re Establishment Inspection of: Wedgewood Village Pharmacy, Inc.*, 270 F.Supp.2d 525, 534-35 (D.N.J. 2003).

statutory language satisfies *Burger's* third criterion by providing a constitutionally adequate substitute for a warrant. *See, e.g., State v. Rechtenbach*, 2002 S.D. 96, ¶¶ 12, 17-20, 650 N.W.2d 290, 293-95 (relying on the fact that the defendant was engaged in a "closely regulated industry" to conclude that two much less specific statutes satisfied *Burger's* third criterion).

[¶14.]    A closely regulated business is one in which the regulation "is sufficiently pervasive and defined that the owner of such facility cannot help but be aware that he 'will be subject to effective inspection.'" *Donovan,* 452 U.S. at 603, 101 S. Ct. at 2540 (quoting *Biswell,* 406 U.S. at 316, 92 S. Ct. at 1596). The duration of a regulatory scheme is an "important factor" in determining whether an industry is closely regulated. *Burger,* 482 U.S. at 701, 107 S. Ct. at 2643. If the statutory provisions regulating the business are extensive and have been in effect for a substantial period of time, courts will find that the business is closely regulated. *Id.* at 704-07, 107 S. Ct. at 2644-46. *Burger* instructs that a regulatory scheme is deemed "extensive" and the business is "closely regulated" if the regulations require acquisition of a license; maintenance of records that are open to inspection; assessment of civil fines, loss of license or a criminal penalty for regulatory violations; and, there is similarly extensive regulation in other states. *Id.* at 704-05, 107 S. Ct. at 2644-45. South Dakota's taxidermy regulatory provisions meet these requirements.

[¶15.]    SDCL 41-6-33, in effect for over eighty-five years, makes it a criminal offense to preserve or mount birds, animals, or fish that a person does not own (the business of taxidermy) unless that person has been licensed by the Game, Fish and

Parks Commission. Licensure authorizes the possession of such birds, animals and fish at the taxidermist's place of business for the sole purpose of preserving or mounting. *Id.* Such specimens or parts thereof may be transported only to a licensee for preserving and mounting and for return to the owner. *Id.* And as is particularly relevant here, the statute directs how and when taxidermists will be inspected. The statute informs the licensee that he or she must keep specifically enumerated records of customers' specimens and make those records and specimens available for inspection by Department representatives any time[7] during normal business hours.

> Each licensee shall keep a written record of all birds, animals, and fish received by the licensee. The record shall include the name and address of each specimen's owner, the number and species, and the dates of receipt and delivery of each specimen. The record and customers' specimens shall be made available for inspection by any representative of the Department of Game, Fish and Parks during normal business hours.

SDCL 41-6-33. A review of reported decisions reflects that this type of regulation of taxidermy is not uncommon in other states. *See People v. Taylor*, 138 Ill.2d 204, 214-15, 561 N.E.2d 667, 672 (1990). *See also infra* note 10.

[¶16.]     Administrative rules impose further regulatory detail. ARSD 41:09:11:02 sets the license fee at $15. This minimal fee is significant. As the Illinois Supreme Court explained, a minimal fee (in that case $25) "demonstrates that police regulation, rather than revenue raising, was the motive behind the

---

7.    We have held that statutes authorizing administrative inspections "any time" provide sufficient specificity to satisfy *Burger* if the business is closely regulated. *See infra* ¶¶ 30-31 (discussing *Rechtenbach*, 2002 S.D. 96, 650 N.W.2d 290).

General Assembly's enactment of the licensing procedure." *Taylor*, 138 Ill.2d at 215, 561 N.E.2d at 672 (discussing the regulation of taxidermy).

[¶17.]    The administrative rules also define terms, set forth requirements for tagging and receipt of specimens, set forth requirements for transferring specimens, and provide for civil license revocation for violations of the statute or rules. ARSD §§ 41:09:11:04 to :06. With respect to records, the administrative rules require that the records specified in SDCL 41-6-33 be kept separately for each customer. ARSD 41:09:11:03. That regulation also requires that the records be kept for five years, a timeframe within the Department's horizon for performing taxidermy inspections. *See supra* ¶ 6.[8]

---

8.    The dissent concludes that "two pages" of regulations are insufficient. Dissent ¶ 41. But *Burger* pointed out that the number of pages of regulations is not the determining factor in deciding whether a business is closely regulated. 482 U.S. at 705 n.16, 107 S. Ct. at 2645 n.16.

> Although the number of regulations certainly is a factor in the determination whether a particular business is "closely regulated," the sheer quantity of pages of statutory material is not dispositive of this question. Rather, the proper focus is whether the "regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes."

*Id.* (citing *Donovan,* 452 U.S. at 600, 101 S. Ct. at 2539). As detailed above, SDCL 41-6-33 and these implementing regulations govern virtually all aspects of the business of taxidermy; i.e., the receipt, possession, transfer, and recordkeeping required to process a customer's specimens. Considering these requirements together with the requirement of state and federal licensure and the fact that inspections may be conducted any time during normal business hours, it is difficult to imagine how any licensed taxidermist would not be aware that his or her records were subject to inspection for the purpose of determining compliance with the statute and regulations.

[¶18.] *Burger* makes clear that the relevant inquiry examines the "nature of the regulatory statute," 482 U.S. at 703, 107 S. Ct. at 2644, and the "duration of [this] particular regulatory scheme." *Id.* at 705, 107 S. Ct. at 2645. South Dakota's regulatory statute contains the same regulatory components as the New York statute that satisfied *Burger's* requirements for a closely regulated industry.[9] Considering South Dakota's eighty-five year history of statutorily required licensure, recordkeeping, and records production, taxidermists must certainly be aware that their specimens and records are subject to governmental oversight and inspection. *See Burger*, 482 U.S. at 703-04, 107 S. Ct. at 2644; *Donovan,* 452 U.S. at 603, 101 S. Ct. at 2540. Indeed, the only two reported cases applying *Burger* to taxidermy statutes[10] like SDCL 41-6-33 have stated that taxidermy is a closely

---

9.   The dissent would not find closely regulated business status without requiring additional agent "training," "written" policies and directives reflecting agency "priority," and agency recordkeeping of the results of inspections. Dissent ¶ 46. Even if these internal agency matters were worthy of consideration by those executive officers charged with managing the Department, they are not necessary to establish a closely regulated business. *Burger* is clear. The relevant consideration is "the *regulatory framework* governing [the] *business* and the *history* of regulation. . . ." *Burger*, 482 U.S. at 707, 107 S. Ct. at 2646 (emphasis added).

10.  The Wyoming statute provided:

> The owner or operator of any commercial operation or business permitted under this act shall upon request of any department personnel exhibit the records required to be maintained by the commission and permit inspection of the premises pertaining to the business or operation, during reasonable business hours.

Wyo. Stat. Ann. § 23-6-111 (1977).

The Pennsylvania statute provided:

(continued . . .)

regulated business. *See United States v. Johnson,* 994 F.2d 740, 742 (10th Cir. 1993) (stating that "[defendant], as the owner of a closely regulated business [a taxidermy shop], was subject to regulatory inspections") (citing *Burger,* 482 U.S. at 699-701, 107 S. Ct. at 2642-43); *Showers v. Spangler*, 957 F.Supp. 584, 591 n.5 (M.D. Pa. 1997) (stating "that the closely regulated industry exception does apply to taxidermists as a general matter"), *rev'd on other grounds*, 182 F.3d 165 (3rd Cir. 1999). In accordance with *Burger*, we conclude that Klager was operating a closely regulated business.

[¶19.] Because owners of closely regulated businesses have "a reduced expectation of privacy," *Burger,* 482 U.S. at 707, 107 S. Ct. at 2646, a warrantless inspection is deemed reasonable within the meaning of the Fourth Amendment if three criteria are met. First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made. *Id.* at 702, 107 S. Ct. at 2644. Second, the warrantless inspection must be necessary to further the regulatory scheme. *Id.* Third, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Id.* at 703, 107 S. Ct. at 2644.

---

(. . . continued)

> Each permit holder shall keep accurate records of all transactions carried out under authority of the permit issued and any other information required by the director. The records must be kept for a period of three years and shall be open to inspection by any officer of the commission during normal business hours and shall be the basis of any reports required by the commission.

34 Pa. Cons. Stat. Ann. § 2907 (1993).

[¶20.]     *Burger's* first criterion is satisfied. We have long recognized that wildlife is the property of the State.

> At common law, wild game was deemed to be the property of the sovereign or state and not of the private real property owner. *State v. Pollock*, 42 S.D. 360, 365, 175 N.W.2d 557, 558 (1919). . . . This common law doctrine was reinforced in 1899 by the passage of what is now SDCL 41-1-2, which provides in part, that "any game bird, game animal, or game fish . . . shall always and under all circumstances be and remain the property of the state[.]"

*Reis v. Miller*, 1996 S.D. 75, ¶ 29, 550 N.W.2d 78, 84 (Gilbertson, J., concurring). Therefore, we have held that "[t]he citizens of this state have an interest in the management of wildlife so that it can be effectively conserved." *State v. Halverson*, 277 N.W.2d 723, 724 (S.D. 1979). *See also* SDCL title 41 (containing the statutes that manage, protect and conserve wildlife resources); *State v. Morrison*, 341 N.W.2d 635, 637 (S.D. 1983); *State v. Pollock*, 42 S.D. 360, 175 N.W. 557 (1919).

[¶21.]     With respect to the second criterion, at oral argument, Klager conceded that warrantless inspections are necessary to further taxidermy regulation. He must concede the point as the record reflects that because of illegal harvesting, trafficking, and possession of wildlife, unannounced inspections are crucial to effective enforcement of the regulatory scheme.

[¶22.]     Klager, however, argues that the third criterion has not been satisfied. Klager contends that SDCL 41-6-33 has insufficient standards limiting the officer's discretion in the frequency and procedures of inspections. This argument fails to recognize that *Burger* approved enforcement of an analytically identical New York statute that contained the same standards (or lack of standards) as SDCL 41-6-33. *See Burger,* 482 U.S. at 694, 711, 107 S. Ct. at 2639, 2648.

[¶23.]     To satisfy the third *Burger* criterion, "the regulatory statute must perform the two basic functions of a warrant": i.e., (1), it "must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope"; and (2), it "must limit the discretion of the inspecting officers." *Id.* at 703, 107 S. Ct. at 2644. To fulfill the first function, "the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'" *Id.* (quoting *Donovan*, 452 U.S. at 600, 101 S. Ct. at 2539). To fulfill the second function, the statute must be "carefully limited in time, place, and scope." *Id.* (quoting *Biswell*, 406 U.S. at 315, 92 S. Ct. at 1596).

[¶24.]     *Burger* held that both functions of a warrant are satisfied by statutory language containing the standards found in SDCL 41-6-33. The Supreme Court began its analysis by identifying the provisions of the New York vehicle-dismantler statute that were "pertinent" to the Fourth Amendment inquiry. *Burger*, 482 U.S. at 694 n.1, 107 S. Ct. at 2639 n.1. Like SDCL 41-6-33, the pertinent provisions of the New York statute only required licensure, recordkeeping, and production of enumerated records during normal business hours. The New York statute provided:

> Every person required to be registered pursuant to this section shall maintain a record of all motor vehicles, trailers, and major component parts thereof. . . . Such records shall be maintained in a manner and form prescribed by the commissioner. . . . Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.

*Burger*, 482 U.S. at 694 n.1, 107 S. Ct. at 2639 n.1 (citing N.Y. Veh. & Traf. Law § 415-a5 (McKinney 1986)). Although the New York statute was silent on the frequency and procedure of inspections, *Burger* concluded that it satisfied both warrant requirements making such statutory language a "constitutionally adequate substitute for a warrant." *Id.* at 711, 107 S. Ct. at 2648.

[¶25.]    With respect to the first warrant requirement, *Burger* explained that such statutory language "informs [the business owner] that inspections will be made on a regular basis"[11] and provides notice "that the inspections to which [the licensee] is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute." *Id.* The Court concluded that such language satisfied the first warrant requirement because it "sets forth the scope of the inspection," "places the operator on notice as to how to comply with the statute," and "notifies the operator who is authorized to conduct an inspection." *Id.* SDCL 41-6-33 satisfies these requirements because it contains the same pertinent provisions: they set forth the scope of the inspection (the inspection of records and specimens during normal business hours), notify the taxidermist how to comply

---

11.    As the Massachusetts Supreme Court observed in a similar case:

> If the Supreme Court was able to find that the New York statute informed licensees that there would be regular inspections (although that statute says nothing explicitly to that effect), the Supreme Court would presumably reach the same conclusion as to the Massachusetts statutes, which are equally silent on this point.

> *Com. v. Eagleton*, 402 Mass. 199, 205 n.10, 521 N.E.2d 1363, 1366 n.10 (1988).

-16-

with the statute, and notify the taxidermist who is authorized to conduct the inspection.[12] There is no dispute that Klager had such knowledge. He helped the Department write the regulations and the latest version of the statute.

[¶26.] With respect to the second warrant requirement, *Burger* concluded that the New York statute adequately limited the discretion of the inspecting officers. Although there were no frequency of inspection standards, the New York statute adequately limited the discretion of the inspecting officers because:

> [T]he "time, place, and scope" of the inspection is limited to place appropriate restraints upon the discretion of the inspecting officers. The officers are allowed to conduct an inspection only "during [the] regular and usual business hours." The inspections can be made only of vehicle-dismantling and related industries. And the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as "any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises."

---

12. The dissent claims that the scope of the statute is too broad because it would permit a conservation officer to go into a private home "searching for a taxidermist's records and specimens." Dissent ¶ 51. The dissent claims that "there is no required place where those items shall be kept." *Id.* The dissent is incorrect. The statute plainly requires that the specimens may only be possessed "at the taxidermist's place of business." SDCL 41-6-33. Further, the administrative rules require immediate tagging upon receipt of the specimen. The written tag must also remain with the specimen at all times. Finally, the customers' specimens (which must be kept in the licensee's place of business) shall be made available for inspection only "during normal business hours." *Id.* This regulatory framework contemplates inspection requests at the business premises. More importantly, the dissent misreads what is authorized by the statute. SDCL 41-6-33 does not purport to authorize searches in any locations. The statute only provides that *the taxidermist* must make specimens and records "available" for inspection or face a misdemeanor penalty.

*Burger*, 482 U.S. at 711-12, 107 S. Ct. at 2648 (citations and footnotes omitted).

Because SDCL 41-6-33 contains these same limitations on a conservation officer's discretion, the South Dakota language adequately limits an inspector's discretion.

[¶27.] Ultimately, because there is no material difference in the pertinent provisions of the New York and South Dakota statutes, SDCL 41-6-33 contains the standards necessary to satisfy both substitute warrant requirements of the third *Burger* criterion.[13] The language of SDCL 41-6-33 comfortably fits within *Burger's* holding regarding substitute warrant requirements. As the Supreme Court noted,

---

13. The dissent's reliance on *Showers*, 957 F.Supp. 584, is misplaced. The dissent correctly cites *Showers* for the proposition that a taxidermy regulation was "unconstitutional because it failed to limit the officer's discretion through careful limitations of place and scope." *See* dissent ¶ 53. But the administrative regulation in *Showers* exceeded the scope of the underlying inspection statute, and the court found no constitutional problem with the statute, which is analogous to SDCL 41-6-33. *See supra* note 10. More specifically, the court found that while the statute only authorized the inspection of business records, the regulation expanded the statute to include "premises inspections," which was not authorized by statute. *Showers*, 957 F.Supp. at 591. The court further concluded that the premises search regulation did not satisfy *Burger* because the regulation did not "make clear what premises [could] be inspected, or what [could] be examined on those premises." *Showers*, 957 F.Supp. at 592. In contrast, SDCL 41-6-33 limits inspections to the taxidermist's statutorily enumerated records and specimens that may only be possessed at the taxidermist's place of business. Therefore, *Showers* provides no support for the dissent's claim that SDCL 41-6-33 fails to satisfy *Burger's* third criterion.

Additionally, *Showers* rejected the dissent's view that frequency standards are necessary in addition to the limiting language in statutes like SDCL 41-6-33. That court specifically held that "[w]hile the Inspection Regulation does not specify when inspections may be conducted, [Pennsylvania's] Inspection Statute authorizes inspections only during 'normal business hours.' Such a limitation is sufficient under *Burger*. 482 U.S. at 711, 107 S. Ct. at 2648, 96 L. Ed. 2d at 619." *Showers*, 957 F.Supp. at 592 (internal citation omitted). Because the Pennsylvania and South Dakota statutes are so similar, *Showers* fully supports this writing.

when "[e]ach licensee is annually furnished with a revised compilation of ordinances that describe his obligations and define the inspector's authority[, the business owner] is not left to wonder about the purposes of the inspector or the limits of his task." *Biswell*, 406 U.S. at 316, 92 S. Ct. at 1596.

[¶28.] It must be emphasized that *Burger* specifically rejected the dissent's view that additional standards regarding the frequency of, and procedures for, inspections are required.[14] The Supreme Court held it was enough that the New York *statute* restricted the administrative inspection to regular business hours and to the regulation's limited subject-matter and records thereof. *Burger*, 482 U.S. at 711, 107 S. Ct. at 2648. Concededly, frequent enforcement activities may play a role in regulatory inspection cases involving statutes that contain fewer or no guidelines regarding the time, place and purpose of the inspection. *See, e.g., infra* ¶ 31 (discussing *Rechtenbach*, 2002 S.D. 96, ¶ 9, 650 N.W.2d 292-93; *State v. Barton*, 2001 S.D. 52, ¶ 12, 625 N.W.2d 275, 279; and *Ritter v. Johnson*, 465 N.W.2d 196, 200 (S.D. 1991)). But the *Burger* analysis of the New York statute did not rely on the extent of enforcement activities to conclude that the warrant substitute

---

14. The dissent's reliance on *State v. Lecarros*, 187 Or. App. 105, 107, 66 P.3d 543, 545 (Or. Ct. App. 2003) is misplaced. *See* dissent ¶ 55. The dissent cites *Lecarros* for the proposition that administrative "searches" are unconstitutional under the third *Burger* criterion unless the government creates rules to guide an officer's discretion. *Id*. Although this general proposition is correct, *Lecarros* did not involve the lesser expectation of privacy recognized in the operation of a closely regulated business. It involved the higher expectation of privacy accorded a private citizen who was operating his recreational boat on a public waterway. 187 Or. App. at 107, 66 P.3d at 545. *Lecarros* has no application to an administrative request to produce business records of a licensee who had agreed to produce the records as a condition of licensure.

requirement of the third criterion was satisfied. *Burger* looked solely to statutory language like SDCL 41-6-33, concluding that it alone contained sufficient standards to make it "clearly fall within the well-established exception to the warrant requirement for administrative inspections of 'closely regulated' businesses." *See Burger*, 482 U.S. at 712, 107 S. Ct. at 2649. The dissent's view that the similarities in the New York and South Dakota statutes are "beside the point," dissent ¶ 57, highlights its error. *Burger* clearly stated that to provide the warrant substitute under the third criterion, "the regulatory *statute* must perform the two functions of a warrant." 482 U.S. at 703, 107 S. Ct. at 2644 (emphasis added). *See also Donovan*, 452 U.S. at 605, 101 S. Ct. at 2540 (noting that the "act itself" contains sufficient standards).

[¶29.]     Were there any question about the need for additional standards concerning the frequency and procedures of inspections, the matter was laid to rest by the majority's rejection of Justice Brennan's dissent calling for additional standards. Exactly like today's dissent, *see* dissent ¶ 54, Justice Brennan argued that additional standards regarding the frequency of inspection were necessary because:

> The statute does not inform the operator of a [] business that inspections will be made on a regular basis; in fact, there is no assurance that any inspections at all will occur. There is neither an upper nor a lower limit on the number of searches that may be conducted at any given operator's establishment in any given time period. Neither the statute, nor any regulations, nor any regulatory body, provides limits or guidance on the selection of [the business] for inspection. In fact, the State could not explain why Burger's operation was selected for inspection.

*Id.* at 722-723, 107 S. Ct. at 2654 (Brennan, J., dissenting). But the *Burger*

majority rejected this view of statutory language like SDCL 41-6-33.[15] In fact,

---

15. The *Burger* majority did not overlook the dissent's concern regarding procedures for how to conduct inspections under similar statutory language. On the contrary, *Burger* rejected the same argument the dissent raises today. *Burger* stated:

> With respect to the adequacy of the statutory procedures, this case is indistinguishable from *United States v. Biswell*. . . . The Court held that the statute gave a firearms dealer adequate notice of "the purposes of the inspector [and] the limits of his task." *Id.* at 316, 92 S. Ct. at 1596.

482 U.S. at 712 n.22, 107 S. Ct. at 2648 n.22.

The *Burger* majority did not overlook the dissent's concern regarding standards on when inspections will be conducted. On the contrary, *Burger* rejected the dissent's view. *Burger* stated:

> Respondent contends that § 415-a5 is unconstitutional because it fails to limit the number of searches that may be conducted of a particular business during any given period. While such limitations, *or the absence thereof,* are a factor in an analysis of the adequacy of a particular statute, they are not determinative of the result *so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers. Indeed, we have approved statutes authorizing warrantless inspections even when such statutes did not establish a fixed number of inspections for a particular time period.* And we have suggested that, in some situations, inspections must be conducted frequently to achieve the purposes of the statutory scheme.

*Id.* at 712 n.21, 107 S. Ct. at 2648 n.21 (emphasis added).

*Donovan* further explained that the frequency and timing of inspections is not the test. The frequency and timing of the inspections helps determine whether, under the language of the legislative enactment, the business owner "is not left to wonder about the *purposes of the inspector* or the *limits of his task*." *Donovan*, 452 U.S. at 604, 101 S. Ct. at 2541 (emphasis added) (citing *Biswell*, 406 U.S. at 316, 92 S. Ct. at 1596). SDCL 41-6-33 and the administrative regulations leave no doubt about the purpose of the inspector and the limits of the inspector's task.

*Burger* concluded that language like that in SDCL 41-6-33 meets the substitute warrant requirements even though New York could not explain why that vehicle dismantler had been targeted for inspection. *Burger*, 482 U.S. at 694 n.2, 107 S. Ct. at 2639 n.2. In light of the *Burger* majority, we have no authority to apply today's dissent adopting Justice Brennan dissenting view of language like that found in SDCL 41-6-33. We are bound to follow the *Burger* majority on issues of federal constitutional law.

[¶30.]     The dissent's desire to require additional enforcement standards and procedures is also at odds with our own jurisprudence. In *Rechtenbach*, 2002 S.D. 96, 650 N.W.2d 290, this Court applied the third *Burger* criterion to two statutes authorizing the inspection of commercial trucks. Both statutes had far fewer standards than SDCL 41-6-33. One statute broadly authorized "any law enforcement officer [to] require the driver of a commercial vehicle to stop a vehicle *at any time* for inspection to determine whether the provisions of this chapter are being complied with." *Rechtenbach*, 2002 S.D. 96, ¶ 9, 650 N.W.2d 292-93 (quoting SDCL 49-28-66) (emphasis added). The other authorized stopping "*any vehicle* or carrier to examine, measure, or weigh the vehicle. . . . The agents, patrol officers, motor carrier enforcement officers, and motor carrier inspectors may examine *any* bill-of-lading, registration, license, or permit to determine if the motor carrier is properly registered, licensed, or permitted. . . ." *Id.* (quoting SDCL 32-2-7) (emphasis added).

[¶31.]     In reviewing these substantially more standardless inspection statutes, this Court rejected the dissent's view that administrative inspections

under such language fail to satisfy *Burger's* third criterion. We did so because trucking is a closely regulated industry. *Id.* ¶¶ 7, 12-13, 17-18. "Truck drivers know they may be stopped for inspections at any time. Not only is this the practice nationwide, but South Dakota state law clearly states that a commercial vehicle may be stopped at 'any time.'" *Id.* ¶ 14. Thus, we specifically rejected the dissent's view that statutes allowing administrative inspections of closely regulated businesses at "any time" grant too much discretion. We concluded that "if stops cannot be made at 'any time' truck drivers would be free to violate the law and regulations with impunity." *Id.* ¶ 16. This Court ultimately concluded that in the case of closely regulated businesses, statutory language containing far fewer standards and guidelines than SDCL 41-6-33 "provide[s] adequate limits on what is to be inspected, and on when and where the inspection is to take place" thus satisfying all three *Burger* criteria. *Rechtenbach*, 2002 S.D. 96, ¶ 20, 650 N.W.2d at 295. We have also reached the same conclusion under other broad regulatory language on two additional occasions. *See State v. Barton*, 2001 S.D. 52, ¶ 12, 625 N.W.2d 275, 279 (concluding that SDCL 32-22-50[16] satisfies the *Burger* requirements in a closely regulated industry); *Ritter v. Johnson*, 465 N.W.2d 196, 200 (S.D. 1991) (same).

---

16. That statute merely provided:

> Any peace officer having reason to believe that the weight of a vehicle and load is unlawful is authorized to weigh the same either by means of portable or stationary scales and may require that such vehicle be driven to the nearest scales in the event such scales are within five miles.

SDCL 32-22-50.

[¶32.]     In sum, Klager had no actual subjective expectation of privacy regarding the records he was required to produce as a condition of his licensure. He knew he was subject to warrantless inspections as a condition of his licensure and he gave his written consent for the inspection. This is fatal to Klager's challenge, and his conviction must be affirmed on this ground alone. Additionally, considering the absence of any actual subjective expectation of privacy, Klager presents a far stronger case for the statutory requirement of *production* from business licensees than the *search* approved in *Burger*: a premises search of a vehicle dismantler who was not licensed and who had not given his consent to the inspection.

[¶33.]     Klager also misapplies the law regarding the reasonableness of administrative inspections of taxidermists' records. Klager fails to acknowledge the significance of the fact that taxidermists engage in a business that has been regulated and required to produce these records for eighty-five years. Klager ultimately fails to recognize that *Burger* upheld administrative enforcement of statutory language that is analytically identical to SDCL 41-6-33. Similarly, the dissent fails to acknowledge that *Burger* approved *enforcement* of the same pertinent statutory provisions that contained none of the additional standards, agency priority statements, agency training requirements, and agency recordkeeping requirements that the dissent desires the Department to adopt. *See Burger,* 482 U.S. at 694, 711, 107 S. Ct. at 2639, 2648.

[¶34.]     The Tenth Circuit Court of Appeals succinctly captured the essence of the inquiry in administrative inspections of taxidermy businesses: "Such warrantless inspections are deemed reasonable under the Fourth Amendment when

performed pursuant to a plan which incorporates specific and neutral criteria."

*Johnson*, 994 F.2d at 742 (citing *Burger*, 482 U.S. at 702-03, 107 S. Ct. at 2643-44).

SDCL 41-6-33's inspection criteria are specific and neutral. The inspections are

limited to statutorily enumerated records required to be kept and produced as a

condition of licensure. Further, the records are only subject to inspection on the

business premises by Department representatives during normal business hours.

Under *Burger*, such specific and neutral criteria constitute the required standards.

As *Burger* reiterated: "When a [business person] chooses to engage in [a]

pervasively regulated business and to accept a [business] license, he does so with

the knowledge that his business records [and property] will be subject to effective

inspection." 482 U.S. at 700-01, 107 S. Ct. at 2643 (citing *Biswell*, 406 U.S. at 316,

92 S. Ct. at 1596).

[¶35.] Affirmed.

[¶36.] KONENKAMP and SEVERSON, Justices, concur.

[¶37.] GILBERTSON, Chief Justice, and MEIERHENRY, Justice, dissent.


GILBERTSON, Chief Justice (dissenting).

[¶38.] I respectfully dissent. I would conclude that taxidermy is not a

pervasively regulated business in South Dakota. The actual regulation of

taxidermy consists of a single statute with minimal administrative regulations, no

specific direction to game officials on when and how to implement inspections, a

minimal number of actual inspections, and no organized records of when inspections

were conducted or their results. The majority opinion's holding establishes a

dangerous basis to conclude pervasive regulation exists every time the Legislature passes a single statute concerning regulation of an occupation, profession or business enterprise. Moreover, even if taxidermy were pervasively regulated, the regulatory scheme established by Game, Fish and Parks does not comply with all three prongs of the *Burger* test. Specifically, SDCL 41-6-33 and its minimal regulations do not provide constitutionally adequate protections substituting for the protections afforded by the Fourth Amendment warrant requirement. Therefore, I disagree with the majority opinion and circuit court. I would conclude that SDCL 41-6-33, as enforced, is unconstitutional.

### *Taxidermy Not Pervasively Regulated*

[¶39.] The focus of this case is not the overall regulation of wild game in South Dakota; it is the regulation of the taxidermy business. I would conclude that taxidermy is not a pervasively regulated industry in South Dakota. What is significant about the pervasively regulated requirement is that it informs a business owner that he has a reduced, not a non-existent, expectation of privacy. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S. Ct. 1816, 1820, 56 L. Ed. 2d 305 (1978). It is not enough that an industry is pervasively regulated if those regulations do not inform a business owner that his property will be subject to periodic inspections undertaken for specific purposes. *New York v. Burger*, 482 U.S. 691, 703, 107 S. Ct. 2636, 2644, 96 L. Ed. 2d 601 (1987). Furthermore, the Supreme Court has stated that closely regulated industries are an exception rather than the rule, and has rejected an expansion of such an exception. *Marshall*, 436 U.S. at 313, 98 S. Ct. at 1820.

[¶40.]     The Supreme Court of the United States has made clear that whether an industry is pervasively regulated is a threshold test for applying the three *Burger* prongs. *See Burger*, 482 U.S. at 702, 107 S. Ct. at 2643-44.  The majority opinion asserts that "closely regulated industry status is an important consideration in cases like this because it often informs the question whether the statutory language satisfies *Burger*'s third criterion by providing a constitutionally adequate substitute for a warrant."  Majority opinion ¶ 13.  However, it is important to remember that this threshold test is not a prong itself.  *Burger*, 482 U.S. at 702, 107 S. Ct. at 2644.  To lose this distinction is to lose the constitutional foundation for the warrant exception.  *Marshall*, 436 U.S. at 311-12, 98 S. Ct. at 1819-20.

[¶41.]     Using the authority provided by SDCL 41-2-18(24), Game, Fish and Parks adopted two pages of regulations governing taxidermy which, as part of the contents, includes a reproduction of SDCL 41-6-33.  The balance of the two-page document contains the following headings: "Definitions"; "Records"; "Immediate tagging of specimen"; "Transfer of specimens to another taxidermist"; "Buying, Selling, Trading"; and, "Violation is cause for revocation of license."[17]  Thus, a taxidermist in South Dakota must adhere to less than two pages of regulations. These two pages hardly establish a "regulatory presence [that] is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes."  *Burger*, 482 U.S. at 705 n.16, 107 S. Ct. at 2645 n.16 (citing

---

17.   The "Laws and Regulations for Taxidermists" document is appended to this decision.

*Donovan v. Dewey,* 452 U.S. 594, 600, 101 S. Ct. 2534, 2539, 69 L. Ed. 2d 262 (1981)). Even though a taxidermist is told that his or her business records are subject to inspection, this statement alone does not reasonably lead to an expectation that he or she is entering into a business where there is going to be extensive government oversight. While the relevant laws and regulations are provided to taxidermists, they do not indicate how or when they are enforced, if at all. Furthermore, neither the statute nor the taxidermist's application provide a "specific purpose" for why the search is being conducted. *See Donovan*, 452 U.S. at 600, 101 S. Ct. at 2539. Without this information, it is difficult to understand how mere regulation of taxidermy has reached a "pervasive" level.

[¶42.] The circuit court found taxidermy was a pervasively regulated business because taxidermists are required to file an application,[18] pay a fee,[19]

---

18. The application Klager filled out consisted of his name and address. This minimal information is in contrast to the application in *Burger* that required the operator of a vehicle dismantling business to provide "a listing of all felony convictions and all other convictions relating to the illegal sale or possession of a motor vehicle or motor vehicle parts, and a listing of all arrests for any such violations by the applicant and any other person required to be named in the application." *Burger,* 482 U.S. at 704 n.15, 107 S. Ct. at 2645 n.15. The application also required the place of business to conform to code provisions and that "all persons having a financial interest in the business have been determined . . . to be fit persons to engage in such business." *Id.* Also in contrast to *Burger*, SDCL 41-6-33 provides that "[t]he Game, Fish and Parks Commission *shall* approve each taxidermist's license." As noted at oral argument, the statute does not grant Game, Fish and Parks the ability to deny any applicant a license. Unlike most regulated professions, any citizen can get a taxidermist's license, regardless of qualifications or training.

19. The majority opinion argues that the $15 fee for a taxidermist license is significant because it "demonstrates that police regulation, rather than revenue raising, was the motive behind the [Legislature's] enactment of the

(continued . . .)

keep records of specimens they receive, make their records available for inspection, and be subject to criminal punishment for failure to comply. These factors are based on a list found in *Burger*. 482 U.S. at 704-05, 107 S. Ct. at 2645. There is no indication that this list was meant to be exhaustive. Furthermore, neither the State nor the majority opinion is able to provide any case law from any other jurisdiction which, after actually analyzing this issue, has construed taxidermy as a pervasively regulated business.[20]

---

(. . . continued)

licensing procedure." Majority opinion ¶ 16. As support, the majority opinion cites *People v. Taylor*, 561 N.E.2d 667, 672 (Ill. 1990). This quote, however, is taken out of context. The Supreme Court of Illinois analyzed whether a criminal statute that prohibited engaging in the business of taxidermy was unconstitutionally vague. To assume that the fee in this case was to facilitate police regulation is to assume legislative intent without any support.

20. The majority opinion relies on *United States v. Johnson*, 994 F.2d 740 (10th Cir. 1993), to support its position that taxidermy is a closely regulated business. Majority opinion ¶ 18. In that case, the defendant owned a taxidermy shop that was searched as part of an investigation of illegal transportation of animal parts. He was prosecuted under federal felony statutes concerning protected game. The court stated that "Mr. Johnson, as the owner of a closely regulated business, was subject to regulatory inspections." *Johnson*, 994 F.2d at 742 (citing *Burger*, 482 U.S. at 699-701, 107 S. Ct. at 2642-43). We do not find this opinion persuasive as the court did not analyze whether taxidermy is closely regulated, rather it merely assumed so. Of interest, however, is the testimony of a conservation officer who worked for the State of Wyoming that he routinely checked taxidermy shops in his area once or twice a year. *Id.* at 743. Additionally, the majority opinion relies on *Showers v. Spangler*, 957 F. Supp. 584, 591 n.5 (M.D.Pa. 1997), *rev'd on other grounds*, 182 F.3d 165 (3rd Cir. 1999), as support that taxidermy is closely regulated. Majority opinion ¶ 18. The footnote in *Showers* concedes that although the plaintiffs in that case suggested that taxidermy was not a closely regulated business under *Burger*, they did "not pursue this argument." We can only conclude from the court's language that the plaintiffs did not fully brief and argue the issue and therefore the court did not conduct an analysis. Although the district court stated it did "believe

(continued . . .)

[¶43.]     The majority opinion relies on the fact that taxidermy has been in the

South Dakota Code since 1925.  Majority opinion ¶ 5.  It is not enough, however, to

rely solely on the length of time because it is the substance of the statute that is

significant.  South Dakota's history of taxidermy regulation is minimal.  SDCL 41-6-

33 was adopted in 1925 and has been revised several times.  S.D. Sess. Laws 1925

ch. 181.[21]  Significantly, the statute as enacted in 1925 required that, to obtain a

_____

(. . . continued)
>   that the closely regulated industry exception does apply to taxidermists as a
>   general matter," the court relied on *Johnson* as support.  Therefore, the
>   majority opinion has failed to provide any authority resulting from actual
>   analysis that taxidermy is a closely regulated industry.

21.   The revisions have been minor.  Regarding inspections, the original statute,
      adopted in 1925 (S.D. Sess. Laws 1925, ch. 181), was amended in the 1939
      codification although the scope of the statute remained basically the same.
      The 1939 revision provided, "Each such licensee must keep a written record
      of all birds, animals, and fish received by him, and the books, offices, or
      buildings in which such records and such specimens are kept must at all
      times be open for inspection by any representative of the Commission."  SDC
      § 25.0302(11) (1939).  The language regarding inspections remained
      unchanged until 2003, when the Legislature amended the statute:

>   Each licensee shall keep a written record of all birds, animals,
>   and fish received by ~~him~~ the licensee.  The record shall include
>   the name and address of each specimen's owner, the number
>   and species, and the dates of receipt and delivery of each
>   specimen.  The ~~books, offices, or buildings in which records and
>   specimens are kept shall at all times~~ record and customers'
>   specimens shall be ~~open~~ made available for inspection by any
>   representative of the Department of Game, Fish and Parks
>   during normal business hours.

   S.D. Sess. Laws 2003, ch. 222, § 1.

   The 1925 statute declared violations to be a misdemeanor with a fine of not
   less than $10 or more than $100.  The 1939 revision set forth no explicit
   criminal or civil penalties for a violation.  The clause providing criminal
   penalties was not reinstated until 1991.  S.D. Sess. Laws 1991, ch. 337, § 25.
                                                          (continued . . .)

license for taxidermy, the applicant must be a "properly accredited person." Moreover, the licensee must "prove to the satisfaction of the state game warden that he is a fit person to be entrusted with such a privilege[.]" S.D. Sess. Laws 1925, ch. 181, § 1. However, the portion of SDCL 41-6-34, which related to proof of fitness required for a taxidermist's license and existed from 1925 to 1991, was repealed by the Legislature in 1991. This indicates a legislative intent for less, not more, regulation of the taxidermy industry. There are no other statutes related to taxidermy, with the exception of SDCL 41-2-18. While the history of the statute may date back to 1925, the substance has been relatively unchanged and the extent of statutory oversight diminished for substantial periods of time.

[¶44.]	Next, the enforcement of the statute by Game, Fish and Parks does not demonstrate that taxidermy is being pervasively regulated by that agency. This Court cannot look at what state officers are *supposed* to do in a vacuum. When the record is available, we must also look at what they *actually* do. Officer Brown testified that he had only done four inspections in eight years. Despite being in Brown County for eight years and actually driving by the Klager premises, he had never previously inspected it. Officer Cochran testified to conducting four inspections in three-and-a-half years. Klager testified he had never been inspected in the eight-and-a-half years he had been in the business. The Law Enforcement Program Administrator for Game, Fish and Parks, Andy Alban, estimated that one hundred inspections were done every year. He also stated that there are

---

(. . . continued)

     Thus, between 1939 and 1991, there was no penalty for failing to comply with the statute.

approximately 200 licensed taxidermists in South Dakota. However, additional testimony revealed that Game, Fish and Parks does not keep records of whether or when a business is inspected. Thus, when officers report that they conducted an inspection of a taxidermist, that information is not connected to the individual taxidermist's record. It is therefore impossible to know how often or how many taxidermists have been actually inspected. There is no requirement that every taxidermist ever be inspected.

[¶45.] Furthermore, there is conflicting testimony about whether officers receive any training regarding administrative searches. The majority opinion fails to recognize the dispute in the record regarding training of Game, Fish and Parks officers in conducting inspections. Majority opinion ¶ 6. Shon Eide testified that he used to be the Training Coordinator for Game, Fish and Parks before becoming the Licensing Supervisor. He stated that new officers are "given a general knowledge base of how to do inspections . . . and which items or which areas that we need to do inspections in." However, Eide never testified specifically to Officer Brown's training. He also did not state what constituted a "general knowledge base" or during what time period that type of training was conducted. Officer Brown was unequivocal in testifying that he had not received any training on conducting inspections.

[¶46.] The evidentiary conflict is between no training and "a general knowledge base of how to do inspections." Certainly if this was a pervasively regulated area, then officers would need guidance on how to conduct their searches appropriately. There is no conflict, however, that whether and how often the

searches should be conducted is completely at the discretion of individual officers. According to Officer Cochran, "I am just working on still getting around to all of [the taxidermists] with all of our other inspections that we do. That's like I said, usually go and visit with them when we get a chance." There is no agency policy or regulation regarding the frequency of the searches, which demonstrates that such searches are not an agency priority. If taxidermy was pervasively regulated, there would be some written policy or directive regarding the frequency of the searches and a record of the results. In examining taxidermy's regulatory scheme as a whole, the history, language, and enforcement do not indicate that it is a pervasively regulated business.[22]

[¶47.]        Because the State has not proven that taxidermy is a pervasively regulated business in South Dakota and thus failed to fulfill the threshold requirement, the three prongs of the *Burger* test need not be applied. But even if taxidermy were pervasively regulated in South Dakota, the search of Klager's

---

22.    The regulation of attorneys makes an interesting subject for comparison. The regulation is mandated by the South Dakota Constitution, art. V, § 12. The licensing and regulation of attorneys fills four chapters of the Code. SDCL chs. 16-16, 16-17, 16-18 and 16-19. A chapter is dedicated to a single subject – the discipline of attorneys. SDCL ch. 16-19. Attorneys are also subject to the South Dakota Rules of Professional Conduct found in the appendix to SDCL ch. 16-18 which takes up an additional 142 pages in the Code. The rules are enforced by the Disciplinary Board of the State Bar of South Dakota and ultimately the South Dakota Supreme Court. The substantial case law that exists also establishes a long term enforcement of the rules for the protection of the public and removal of those who commit serious violations.

records would still be unconstitutional because the enforcement of SDCL 41-6-33 fails to satisfy the *Burger's* third prong.[23]

**Burger's *Third Prong Not Satisfied***

[¶48.]     The third prong of *Burger* requires that "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant."  482 U.S. at 703, 107 S. Ct. at 2644.  "In other words, the regulatory statute must perform the two basic functions of a warrant: [1] it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and [2] it must limit the discretion of the inspecting officers."  *Id.*  We now address the scope of a search under SDCL 41-6-33 and the discretion of officers in conducting such a search.[24]

---

23.     I agree with the majority opinion that prong one of the *Burger* test is satisfied.  Because Klager conceded prong two at oral argument, I do not analyze the issue here.

24.     The majority opinion notes that "the businessman in a regulated industry in effect consents to the restrictions placed upon him."  Majority opinion ¶ 13 (citing *Marshall*, 436 U.S. at 313, 98 S. Ct. at 1821).  Immediately above the signature line, the application for a taxidermy license states, "I will keep a record of all specimens received for mounting or preserving.  These records and specimens shall be made available for inspection by any authorized representative of the South Dakota Department of Game, Fish and Parks during normal business hours.  Specimens will be tagged according to regulation."  It is significant that taxidermists must consent to searches under SDCL 41-6-33 before they can obtain a license.  We should be careful in expanding the "consent" in this case, because it was made in order to obtain a license, which amounts to holding a taxidermist's livelihood hostage.

-34-

*Defined Scope*

[¶49.] To advise business owners that a "search is being made pursuant to the law and has a properly defined scope . . . the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'" *Id.* (citing *Donovan,* 452 U.S. at 600, 101 S. Ct. at 2539). Normally, the scope of a search is confined by a warrant. U.S. Const. amend. IV (a warrant must state with particularity the place to be searched and the things to be seized). The scope of warrantless administrative searches must be confined by the controlling statutes and regulations.

[¶50.] The scope of SDCL 41-6-33 is very broad, as it allows inspection of "customer specimens" and customer records – basically all that would be of interest to officials charged with enforcement of the game laws in this State concerning inspection of a taxidermy business. While the relevant laws and regulations are provided to taxidermists and conservation officers, they do not limit the scope other than to business hours and to records from the last five years. Nor do the regulations provide any limitations to the scope of the officers' discretionary searches of taxidermists.

[¶51.] In reading SDCL 41-6-33 and the corresponding regulations, the requirement is that records "shall be made available," but there is no required place where those items shall be kept. They could be at a taxidermist's business, but also at a home or other location not open to the public. A taxidermist's business could be located in his home. Without proper training on what is an acceptable location to

search or manner to demand "production" of the records, this could result in a situation where an officer is in a home searching for a taxidermist's records and specimens. *See Warrington Twp. v. Powell*, 796 A.2d 1061, 1069-70 (Pa. Commw. Ct., 2002) (holding that warrantless administrative periodic fire safety inspections of portions of business that are not open to public were not allowed if entry had been refused by owner because there was no evidence to show business was closely regulated). Because conservation officers are not effectively trained on how to conduct searches and there are only vague regulations on where they can go to inspect the records or specimens, the scope of this statute is too broad to provide an adequate substitute for the warrant requirement.

*Limit on Inspecting Officers' Discretion*

[¶52.]     We now turn to the second basic function that a regulatory statute must perform as required by *Burger* – that it limit the discretion of Game, Fish and Parks officers to search under SDCL 41-6-33. *Burger*, 482 U.S. at 703, 107 S. Ct. at 2644. "[I]n defining how a statute limits the discretion of the inspectors, we have observed that it must be 'carefully limited in time, place, and scope.'" *Id.* (citing *United States v. Biswell*, 406 U.S. 311, 315, 92 S. Ct. 1593, 1596, 32 L. Ed. 2d 87 (1972)). The Supreme Court has stated that "[t]he authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." *Marshall*, 436 U.S. at 323, 98 S. Ct. at 1825-26. Although the Court went on to say in *Burger* that "[i]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential," *Burger*, 482 U.S. at 710,

107 S. Ct. at 2648 (citing *Biswell,* 406 U.S. at 316, 92 S. Ct. at 1596), the Court also stated that "warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is *so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected* by government officials."  *Donovan,* 452 U.S. at 599, 101 S. Ct. at 2538 (emphasis added) (citing *Marshall*, 436 U.S. at 323, 98 S. Ct. at 1826).

[¶53.]        The case of *Showers v. Spangler*, 957 F.Supp. 584 (M.D.Pa. 1997), *rev'd on other grounds*, 182 F.3d 165 (3rd Cir. 1999), provides analysis of *Burger*'s third prong.  Pennsylvania Wildlife Conservation officers conducted a warrantless search of Showers' taxidermy shop under Pennsylvania statute and regulations to examine his records, animals, and their parts.  Two mounted animals were seized.  Showers attacked the regulation, claiming it did not sufficiently limit the discretion of the inspecting officers and therefore did not provide a constitutionally adequate substitute for a warrant.  The *Showers* Court concluded that the search and seizure was unconstitutional because it failed to limit the officer's discretion through careful limitations of place and scope.  957 F.Supp. at 591-92 (citing *Burger*, 482 U.S. at 703, 107 S. Ct. at 2644).  *See also Showers*, 182 F.3d at 168 n.1 (upon appeal on other issues, the Third Circuit concluded, "we leave this portion of the District Court's order and its thoughtful analysis, undisturbed").

[¶54.]        After a review of the testimonial record, there is no dispute that administrative searches of taxidermists are done completely at the discretion of individual Game, Fish and Parks officers as long as they are done during business hours.  There is no regulatory limit on the discretion of the individual officers in

choosing whether and how often to conduct a search. *See Burger*, 482 U.S. at 711, 107 S. Ct. at 2648 (stating that "the vehicle dismantler knows that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute."). Inspections could go from non-existent to daily events. The enforcement by Game, Fish and Parks is so "random, infrequent, [and] unpredictable" that, in reality, taxidermists have no real expectation that their business will be searched. *See Donovan,* 452 U.S. at 599, 101 S. Ct. at 2538 (citing *Marshall*, 436 U.S. at 323, 98 S. Ct. at 1826). This is supported by Klager's testimony that he was not searched in eight years and Officer Brown's testimony that he only conducted four inspections in eight years. Infrequency of inspection dilutes the justification for upholding warrantless searches. Unlike the gun dealer in *Biswell*, 406 U.S. at 311, 92 S. Ct. at 1594, or the mine operator in *Donovan*, 452 U.S. at 604, 101 S. Ct. at 2541, the taxidermist who is receiving his first inspection in his eight years of business will be "left to wonder about the purposes of the inspector or the limits of his task." *Biswell*, 406 U.S. at 316, 92 S. Ct. at 1596.

[¶55.] In order to ensure that discretion to conduct administrative searches is not abused by an officer, it is necessary that Game, Fish and Parks establish statutory or regulatory standards to provide adequate protections in lieu of the Fourth Amendment warrant requirement as required by *Burger*'s third prong. *See State v. Lecarros,* 66 P.3d 543, 547 (Or. Ct. App. 2003) (court found that administrative search of boat by officers violated defendant's rights because no "governmental entity ha[d] created rules to limit the discretion of . . . officers in carrying out boat searches or seizures, nor could the officers articulate any such

rules. Indeed, their uncontradicted testimony establishes that the decision to seize or not to seize any particular craft was entirely within their discretion."). Otherwise, "[w]here [the Legislature] has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77, 90 S. Ct. 774, 777, 25 L. Ed. 2d 60 (1970). In other words, if there are no standards, then a warrant is necessary. The statutory or regulatory standards called for by *Burger*'s third prong function like a warrant, which assures an owner that "reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular establishment." *Donovan*, 452 U.S. at 599, 101 S. Ct. at 2538 (citing *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 538, 87 S. Ct. 1727, 1735, 18 L. Ed. 2d 930 (1967)). This assumes that such standards have been enacted, which is not the case here.

[¶56.] In addition to limiting an officer's discretion as to whom to search, statutory or regulatory standards should also address how often searches must be conducted. In *Donovan*, the Supreme Court upheld the Federal Mine Safety and Health Act of 1977 as not offending the Fourth Amendment in part because the Act required inspection of all mines, and specifically defined the frequency of inspection. *Donovan*, 452 U.S. at 603-04, 101 S. Ct. at 2540-41. The Court stated that:

> the Act itself clearly notifies the operator that inspections *will be performed on a regular basis.* Moreover, the Act and the regulations issued pursuant to it inform the operator of what . . . standards must be met in order to be in compliance with the statute. *The discretion of Government officials to determine what facilities to search and what violations to search for is thus directly curtailed by the regulatory scheme.*

*Id.*, 452 U.S. at 605, 101 S. Ct. at 2540 (emphasis added).

[¶57.] The majority opinion repeatedly alleges that SDCL 41-6-33 is analytically similar to the statute at issue in *Burger*.[25] Majority opinion ¶¶ 24, 25, 27, and 33. While similarities may exist, it is beside the point. It is the haphazard *enforcement* of SDCL 41-6-33 that makes it unconstitutional, not the language of the statute itself. The enforcement of the statute in *Burger* differs significantly from the enforcement of SDCL 41-6-33. In *Burger*, the Supreme Court noted that members of the New York City Police Department's Auto Crimes Division conducted five to ten inspections *per day*. 482 U.S. at 693-94, 107 S. Ct. at 2639. This consistent and prevalent enforcement is at the opposite end of the spectrum from the rare, random, and discretionary enforcement of SDCL 41-6-33 in South Dakota. The enforcement of a statute must be examined because the language of a statute cannot be analyzed in isolation.

[¶58.] SDCL 41-6-33 and its regulations do not effectively limit the scope or discretion of a search conducted under this statute. These constitutional flaws in the regulatory scheme are demonstrated through the testimony of the conservation officers. As previously noted, Officer Brown testified that he only conducted four inspections in eight years. He candidly admitted whether a taxidermist's records are checked is completely at his discretion. Officer Cochran

---

25. The majority opinion argues that this view is adopted from Justice Brennan's dissent in *Burger*. Majority opinion ¶ 29. However, this dissent does not include a single citation to Justice Brennan's writing. While the majority opinion may perceive some similarities to his writing, this opinion is an application of the *Burger* majority and Fourth Amendment warrant requirement.

testified to conducting four inspections in three-and-a-half years. Klager testified that he had never been inspected in the eight-and-a-half years he had been in the business. The Law Enforcement Program Administrator for Game, Fish and Parks, Andy Alban, estimated that 100 inspections were done every year. He also stated that there are approximately 200 licensed taxidermists in South Dakota. Significantly, additional testimony revealed that Game, Fish and Parks does not keep records of whether or when a business is inspected. Thus, when officers report that they conducted an inspection of a taxidermist, that information is not connected to the individual taxidermist's record. It is therefore impossible to know how often or how many taxidermists have been inspected. There is no requirement that any taxidermist ever be inspected. Nor is there a requirement that taxidermists submit any records or other information to Game, Fish and Parks on a regular basis. The only time Game, Fish and Parks will see any reference to the records is if an inspection is conducted, and even then only if there is a search of the officer's daily activity logs. Finally, there is still the problem of the officers' lack of training on how to properly conduct searches. *See supra* ¶ 7.[26]

[¶59.] If taxidermy was regulated so that it provided a "constitutionally adequate substitute to the warrant requirement," there would be some written

---

26. This lack of training could result in unintended and dangerous consequences. Although Officer Brown testified that he acted with appropriate demeanor during the confrontation, at trial he conceded that although armed, he had received no training on what to do during an inspection in the event that someone refused to comply with his request to produce records. Klager disputes how Officer Brown acted. Officer Brown testified that during the confrontation he was "pretty emotional" and that Klager was "quite angry" with him. Klager testified, however, that it was a "scary situation . . . I was terrified."

policy or directive regarding the frequency and method of the searches, as well as a record of the results. This manner of unorganized enforcement does not comport with the dictates of *Burger* "in defining how a statute limits the discretion of the inspectors . . . it must be carefully limited in time, place and scope." 482 U.S. at 703, 107 S. Ct. at 2644. In examining the regulatory scheme of taxidermists under the facts of this case, this Court should have concluded that this scheme does not adequately protect Fourth Amendment rights so that a constitutional search of a business can be conducted.

[¶60.] In conclusion, the State has failed to show that taxidermy is a pervasively regulated business in South Dakota. Furthermore, even if taxidermy were pervasively regulated, the search under SDCL 41-6-33 and its regulatory scheme fails *Burger*'s third prong. I would conclude that SDCL 41-6-33, as enforced, is unconstitutional and reverse.

[¶61.] MEIERHENRY, Justice, joins this dissent.